UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TED HERBERT SCHULTEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 1181 |
| v. ) | |
| ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Ted Schulten, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr. Schulten asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Mr. Schulten applied for DIB on September 21, 2005, alleging that he had been disabled since May 2, 2003, as a result of seizures and alcoholic liver disease. (Administrative Record ("R.") 92-94, 112). His application was denied initially and upon reconsideration. (R. 61-73). Mr. Schulten continued pursuit of his claim by filing a timely request for hearing on July 19, 2004. (R. 78-79).

An administrative law judge ("ALJ") convened a hearing on April 25, 2007, at which Mr. Schulten, represented by counsel, appeared and testified. (R. 63-67, 70-73). In addition, Mr. Schulten's wife testified, as did a vocational expert, James Rafke. (R. 47-59). On July 10, 2007, the ALJ issued a decision denying Mr. Schulten's application for DIB because he found Mr. Schulten

would be able to perform certain light work that existed in significant numbers in the regional economy. (R. 15-25). This became the final decision of the Commissioner when the Appeals Council denied Mr. Schulten's request for review of the decision on January 18, 2008. (R. 3-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Schulten has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Schulten was born on October 16, 1952, making him fifty-four years old at the time of the ALJ's decision. (R. 92). He is 5' 6" and weighs 135 pounds. (R. 30-31). He does not have a high school diploma; while he was enrolled for four years, he skipped class too often to graduate. (R. 31). His work experience has been heavy labor as a furniture mover. He owned his own moving company for the fifteen years prior to his DIB application. (R. 34, 57).

### B.
### Medical Evidence

Mr. Schulten's medical record demonstrates a history of seizures and alcohol abuse – and a history of failure to take prescribed seizure medication, Dilantin. In the jumble of records, lab results rather consistently show Dilantin levels to be low in 2000, 2002, and 2003. (R. 214-222). Other tests show results indicative of liver damage – elevated AST (SGOT) and ALT(SGPT) levels, for example. (*Id.*). In 2003, Mr. Schulten was hospitalized for a seizure. He had been working outside on a hot day, and had drunk quite a bit the day before. Also, he had been non-compliant taking his

2

Dilantin, a seizure medication. (R. 194). Other seizure hospitalizations were also associated with drinking.

On February 1, 2006, Mr. Schulten was again hospitalized following a seizure. (R. 282, 285). He had not been taking his seizure medication and had been drinking about fifteen beers a day. (R. 282, 285). He suffered acute alcohol withdrawal symptoms while hospitalized, and was placed on alcohol withdrawal protocols. (R. 282, 285). ECG was consistent with seizure disorder. (R. 290). CT head scan showed mild diffuse atrophy and periventricular chronic ischemic changes of the brain. (R. 292, 294).[1] Carotid dopplers were negative; blood flow to the brain was adequate. (R. 282). It was clear that Mr. Schulten's seizures could not be controlled unless and until he stopped drinking. (R. 285, 292).

During this hospitalization, Mr. Schulten underwent a neuropsychological consultation with Dr. Roberta Stahnke. (R. 283). Mr. Schulten allowed that he had been drinking since age fourteen. His wife left him once because of his drinking, but returned when he said he had quit. (R. 283). In reality, he hadn't. She said she bought beer for him because she was afraid of his temper; he had been physically abusive to her in the past. (R. 283). She described her husband as paying little attention to hygiene or nutrition, and sitting and watching TV all day while drinking. She claimed he has threatened to kill himself in the past. (R. 283).

Dr. Stahnke noted that Mr. Schulten refused to take his medications or follow medical advice to quit drinking. (R. 283). She found him irritable and agitated. She diagnosed alcohol dependence, acute alcohol withdrawal with delirium, and possibly alcohol-induced persisting dementia, which needed to be ruled out. (R. 283). She indicated that Mr. Schulten needed to attend an alcohol abuse

---

[1] Six years earlier, a CT brain scan showed no acute problems. (R. 230).

3

program. (R. 284).

Dr. Gerald Leisten conducted a psychiatric consultation. (R. 287). Mr. Schulten told the doctor that his seizures "may or may not be related to his drinking." (R. 287). Mr. Schulten exhibited problems with concentration, short-term memory, abstraction, math, and reading, probably due to alcohol-related dementia. (R. 283). His insight into his alcohol addiction and his judgment in that regard were, obviously, poor. (R. 288). Mr. Schulten refused to undergo recommended inpatient detoxification treatment, and Dr. Leisten was doubtful as to whether he would attend outpatient treatment. (R. 288). The doctor explained that Mr. Schulten had to get sober and control his seizure to stop his cognitive decline. (R. 288). Mr. Schulten's primary physician agreed. (R. 288).

Just a couple of weeks later, Mr. Schulten's attorney arranged a psychiatric examination with Dr. Mark Admur for Mr. Schulten in connection with his application for benefits. (R. 295). Mr. Schulten was disheveled and unkempt. (R. 298). Mr. Schulten explained that he had been a furniture mover but could no longer work because of his seizures; he was afraid he would hurt someone if he had a seizure while working. (R. 295). Mr. Schulten has trouble pinpointing the year he began experiencing seizures, and had trouble with dates in general. (R. 285). He was very self-pitying. (R. 296). He admitted having trouble controlling his temper. (R. 296). He denied any problem with alcohol, however. (R. 296). He said he last consumed alcohol three weeks prior to the examination – when he had the seizure that prompted his previous hospitalization. (R. 296). His wife concurred. (R. 296).

Mr. Schulten said he just watched televison most of the day, explaining that his interests were limited because he did not go to school. (R. 297). It was the same answer when the doctor asked

4

about reading. (R. 297). His wife said his self-care was deteriorating: he didn't shave, he slept in his clothes. (R. 297). She also said he was forgetful and his conversation was difficult to follow. (R. 297).

Mr. Schulten seemed to understand the questions put to him but, often, his responses were irrelevant. (R. 298). He was unable to name recent presidents or five large cities other than New York and Washington. (R. 298). He said he was unable to subtract three or five from one hundred, but yet had no difficulty calculating he would get $85 in change if he bought $15 worth of items with a $100 bill. (R. 298). Dr. Admur felt that Mr. Schulten's cognitive, personality, and memory changes were all irreversible manifestations of alcohol-related dementia. (R. 298). He explained that this meant:

> that even if he were to maintain total sobriety, significant impairments would persist. (R. 299). Associate with the dementia are deficits in executive functioning that show themselves as impaired judgment, poor appreciation for temporal concepts, and poor attention to self-care. Memory impairments would interfere with his ability to remember instructions. Affective instability predicts that he would be unable to tolerate stress and accept criticism.

(R. 299).

On November 19, 2006, Mr. Schulten was hospitalized for another seizure. (R. 303). He was well-known to the attending physician, who noted his long history of seizures, non-compliance with treatment – Mr. Schulten had not shown up for a recent Dilantin level test – and alcohol dependency. (R. 303). Mr. Schulten admitted that he was still drinking at that time. (R. 303). He had been drinking when the seizure came on. (R. 303). CT revealed no acute intercranial abnormality. (R. 307).

Mr. Schulten was again hospitalized following a seizure on January 16, 2007. (R. 319). The

5

notes from this instance, however, are mostly illegible.

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At his hearing, Mr. Schulten testified that stopped working in 2003, because he was having seizures. (R. 33). He owned his own moving company, and had been a moving van driver before that. (R. 33-34). Mr. Schulten explained that he never finished high school – he always skipped class. (R. 31). His said wife left him because of money problems. (R. 32).

Mr. Schulten denied his seizures were brought on by alcohol. (R. 36). When the ALJ said that the hospital records indicated otherwise, he said he might have had a seizure when he was as young as four years old. (R. 37). Also despite the medical record, he said he had never received treatment for alcohol abuse and had never been told to. (R. 37). He claimed had trouble sleeping at night, but allowed that he drank coffee late at night and lived on a noisy street. (R. 38-39, 45). He said he had no trouble caring for himself, but did not really do any housework aside from cooking. (R. 39). His wife took him grocery shopping. (R. 40). Sometimes he went himself, Mr. Schulten said he still drove twice a week. (R. 40). A neighbor did yard work in exchange for the use of Mr. Schulten's garage. (R. 41). He watched a lot of televison. (R. 42).

Mr. Schulten said he saw his doctor about twice a month. (R. 46). He said he felt good mentally, and admitted that if he took his medication, he had no problems. (R. 46).

### 2.
### Plaintiff's Wife's Testimony

Mr. Schulten's wife testified that she moved out in February 2006. (R. 48). She explained

it wasn't because of money as her husband claimed, but because Mr. Schulten was violent. (R. 48). Also, it was unclear from her testimony whether they lost the moving business because of Mr. Schulten's seizures or because he cut back on his efforts:

> He was excellent at what he did. We had repeat customers, we had families, we had everything. And as the years went on, he would do less and less work. He changed the rules. Okay, now, I'm not going to east of Western, I'm not going to do elevator buildings, I'm not going to a job if I don't have parking, I'm not – you know.

(R. 48). Then, the seizures came on top of all that. (R. 48).

Mrs. Schulten testified that her husband's seizures occurred with or without alcohol use. (R. 49). She couldn't say how long he had gone without alcohol at that time. (R. 50). She said he was depressed and threatened to kill himself. (R. 50). His memory was terrible, as was his concentration. (R. 51). When she would come by, she could see he did no housekeeping at all. (R. 53). She could not understand why he would not take his medication when it seemed to keep him seizure-free. (R. 53). She thought he might have had as many as ten seizures through April 2007, and maybe 25 or 30 in 2006. (R. 55). But she allowed that she could not know for sure, having moved out for over a year and not talking to him every day. (R. 55).

### 3.
### Vocational Expert's Testimony

James Rafke, the vocational expert (VE), testified that Mr. Schulten's past jobs were heavy in exertion, and skilled because he was supervising others. (R.57). The ALJ asked Mr. Radke to consider an individual of the same vocational profile as Mr. Schulten who was limited to work without climbing ladders, ropes, or scaffolding, and without even moderate exposure to work hazards. (R. 57). The VE indicated that such a person could not perform Mr. Schulten's his past work because of the driving required. (R. 57). He stated that such an individual could perform other

7

work, however: about 49,000 light, unskilled jobs in the northeastern Illinois area. (R. 57). If there was a further restriction against more than occasional contact with the public, he estimated the bank of would be reduced to 19,300: 11,300 packing jobs, 4,300 inspecting jobs, and 3,700 mail clerk jobs. (R. 57). But those jobs would be eliminated altogether if the hypothetical individual could not sustain work on a 40 hour work week basis due to interruption by seizures, or if the individual were unable to remember instructions, tolerate stress, or accept criticism. (R.58).

## III.

## THE ALJ'S DECISION

The ALJ found that Mr. Schulten had not engaged in substantial gainful activity since his alleged onset date of May 2, 2003. (R. 20). The ALJ found him to have the following severe impairments: alcohol dependency, dementia, and seizure disorder. (R. 20). The ALJ next determined Mr. Schulten's impairments met listing 12.02 pertaining to organic mental disorders, as well as listing 12.09, pertaining to substance addiction. This was because Mr. Schulten had moderate limitations on his activities of daily living and marked limitations in the areas of maintaining social interaction and maintaining concentration, persistence, or pace. (R. 21). That would ordinarily dictate a finding of "disabled," but not necessarily where substance addiction is involved. *See* 20 C.F.R. § 404.1535. Because that is clearly the case here, the ALJ had to consider the effects of Mr. Schulten's alcoholism. He found that if Mr. Schulten stopped drinking, his remaining impairments would still be severe, but they would no longer meet the Listings. (R. 21). Again assuming Mr. Schulten stopped drinking, the ALJ concluded that Mr. Schulten would have the capacity to perform unskilled, light work that did not require climbing ladders, ropes, or scaffolding; moderate exposure to work hazards; or even occasional contact with the public. (R. 21). He also found Mr. Schulten's

8

allegations regarding the intensity, persistence, and limiting effects of his symptoms less than credible, saying they were not documented by the record. (R. 23). Given the capacity for a limited range of light work, the ALJ determined that Mr. Schulten would be unable to return to his past work as a furniture mover. (R. 24). The ALJ then relied on the testimony of the VE to conclude that Mr. Schulten would still be able to perform jobs that existed in significant numbers in the local economy: 11,300 packing jobs, 4300 inspector jobs, and 3700 mail clerk jobs. (R. 25). Accordingly, the ALJ found that Mr. Schulten was not disabled under the Act and not entitled to DIB. (R. 25).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

9

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

### B.
### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005);

*Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Mr. Schulten argues, generally, that the ALJ's decision was not supported by substantial evidence. More specifically, he finds fault with the ALJ's determination that alcoholism was material to the decision in this case. He claims that in so doing, the ALJ improperly acted as a medical advisor. In addition, Mr. Schulten contends that the ALJ selectively quoted evidence and failed to consider all the evidence of record. He also requests that, if this case is remanded, it be assigned to another ALJ. A remand is, indeed, warranted. But the court has no general power to order that a case be sent back to a different ALJ, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996), and, in any event, Mr. Schulten provides no reason why it should be.[2]

Congress amended the Social Security Act in 1996 to prohibit the payment of social security disability benefits based on an applicant's alcoholism or drug addiction. *See* Contract with America Advancement Act of 1996, Pub.L. 104-121, 110 Stat. 847; *O'Kane v. Apfel*, 224 F.3d 686, 687 (7th Cir. 2000). The amendment was concerned with the fact that, under the prior law:

---

[2] Evidence of bias might provide a reason, *Sarchet, supra,* but there was none presented here.

11

> individuals whose sole severe disabling condition is drug addiction or alcoholism are eligible to receive monthly cash Social Security and SSI disability benefits and medical coverage (Medicare or Medicaid) if they are unable to work because of their addictions. The result is a perverse incentive that affronts working taxpayers and fails to serve the interests of addicts and alcoholics, many of whom use their disability checks to purchase drugs and alcohol, thereby maintaining their addictions.

H.R. REP. 104-379, at 17 (Dec. 4, 1995). Under 42 U.S.C. § 423(d)(2)(C), "an individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." If it happens that a claimant has both has a potentially disabling illness and is a substance abuser, like Mr. Schulten here, the issue for the administrative law judge is whether, were the claimant not a substance abuser, he would still be disabled. 20 C.F.R. § 404.1535(b)(1); *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). If so, he is deemed disabled "independent of . . . drug addiction or alcoholism" and is therefore entitled to benefits. 20 C.F.R. § 404.1535(b)(2)(ii); *Kangail*, 454 F.3d at 629.

Under the amendment and its accompanying regulations, you aren't necessarily out of luck if your disability stems from alcohol or drug abuse. You can "drink yourself disabled" if you do enough irreversible damage that giving up drinking will not result in your being able to work. But you can't go about it half-heartedly. If you have not done sufficient damage at the time you apply for benefits – if you would be able to work if you stopped your alcohol abuse – you would not be entitled to benefits. Although, under the regulations, nothing would stop you from taking up the cause again after the denial and seeing it through.

So, the question for the ALJ here was whether, if Mr. Schulten stopped drinking, would he be able to perform work or would he still be disabled. The record leaves little doubt that his seizures

are linked to his alcohol abuse. His drinking might not have led to the disorder, but it is certainly linked to it, exacerbating the condition. Most of his hospitalizations for seizures have followed on the heels of a drinking binge. One physician, Dr. Wilson, said it was clear "his seizures cannot be well controlled unless he stops drinking." (R. 285). Another, Dr. Leisten, said he had to get sober to control his seizures. (R. 288). So it would seem that there is substantial evidence in the record to support the ALJ's decision that Mr. Schulten's seizure disorder would not preclude all work if he stopped drinking. (R. 24). Mr. Schulten does not argue otherwise.

Mr. Schulten's dementia is another matter. There is no room for doubt that this is a disability of his own manufacturing. Every medical source that discusses it links it directly to his alcoholism. But there is really no evidence that the restrictions the ALJ found resulted from this disorder – loss of memory, inability to concentrate, limitations in the ability to socialize and perform daily activities – would lessen if Mr. Schulten stopped drinking. Mr. Schulten's most recent CT brain scan showed *chronic* changes. They ALJ made no mention of this study, and those aren't the types of changes likely to improve or go away. Moreover, no physician opined that Mr. Schulten's mental status would improve if he stopped drinking. Dr. Stahnke thought he might be suffering from *persistent* alcohol-induced dementia – this had to be ruled out. Dr. Leisten said if he stopped drinking, Mr. Schulten could halt his "cognitive *decline*" – the doctor did not indicate that his functioning would improve. He merely intimated that the condition might not get any worse. And Dr. Admur felt the damage Mr. Schulten had done to his cognitive functioning, personality, and memory was irreversible.

The ALJ did not allude to any of these findings – other than dismissing Dr. Admur's opinion because he was not a treating source and because it was contradicted by the rest of the medical

13

evidence. (R. 24). But, clearly, at least two treating sources had thoughts on Mr. Schulten's dementia that supported those of Dr. Admur. It would seem that in disregarding Dr. Admur's opinion, and those of Drs. Stahnke and Leisten, the ALJ was focusing on the seizure disorder and neglecting the dementia. Yet, the ALJ found that it was Mr. Schulten's dementia that met the listings: listing 12.02 covering organic mental disorders and listing 12.09 covering substance addiction.[3]

More specifically, the ALJ found:

> The "B" criteria is [sic] met, specifically finding moderate limitations in the ability to perform activities of daily living; and "marked" limitations in the areas of ability to maintain social interaction and in the ability to maintain concentration, persistence, or pace.

(R. 21). Then she said that if Mr. Schulten stopped drinking, these limitations would lessen, becoming only mild or moderate, respectively. (R.21). But no doctor said that; they said only that Mr. Schulten's seizure disorder might improve. Instead, the reports are consistent in that, at best, Mr. Schulten's mental status would not deteriorate further. And as it was, the ALJ felt that condition was sufficiently serious to render Mr. Schulten disabled under the listings. The ALJ offers no explanation of what medical evidence led her to believe that this state of affairs would improve if Mr. Schulten stopped drinking. Perhaps she was, in the disability parlance, "playing doctor;" which, of course, she may not do. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).

In short, the ALJ failed to discuss evidence that ran contrary to her decision, and this is cause for remand. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Moreover, that evidence came not just from the consulting physician procured by Mr. Schulten's attorney, but from those who

---

[3] Seizure disorders would be considered under listing 11.00 *et seq.* Mr. Schulten's seizures apparently played no role in the ALJ's conclusion that he met the listings.

14

treated Mr. Schulten. Their opinions are to be accorded some respect. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Hofslien v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir.2006). The ALJ can reject them, of course, but if she does, she must explain why. *Schmidt*, 496 F.3d at 842; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir.2004). Here, she failed to do that. Perhaps she had her reasons, but, as she left them unexpressed – she did not build the requisite "logical bridge" from the evidence to her conclusion. As a result, this is one of those cases where "it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski*, 322 F.3d at 917. The matter must be remanded to the Commissioner for further proceedings.[4]

And that result is unsatisfying. Understandably, it was difficult for the ALJ to find for the claimant. It would be difficult to award benefits to one who creates his own disabilities where so many others have such a misfortune visited upon them through no fault of their own. And that is not to say that alcoholism is not an addiction or a disease; it clearly is. But unlike many, Mr. Schulten made no attempt whatsoever to curb his dipsomania. On every occasion, he refused treatment or rehabilitation. It's not that he tried and failed. It's not that he didn't attend meetings or therapy sessions regularly. No, Mr. Schulten did not even make the feeblest of attempts. He didn't attend one single meeting or therapy session. And he lied to the ALJ about having been told – and he was told repeatedly from all quarters – he had to get treatment. Given his aversion to any suggestion of treatment, perhaps it will come as a surprise to Mr. Schulten that, if he is awarded benefits, he will have to participate in treatment in order to receive them. 20 C.F.R. §404.1536. Moreover, even

---

[4] On remand, a medical advisor may be able to provide some insight into the progression of Mr. Schulten's alcoholic dementia, and whether its effects can be reversed to any degree. *See Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007)(discussing HALLEX I-5-3-14A and Emergency Teletype No. EM-96-94); *Salazar v. Barnhart*, 468 F.3d 615, 623 (10th Cir. 2006).

before the alcoholism took its toll, he was sliding out of his moving business, refusing many jobs simply because they were inconvenient for him. So in many respects, he is a difficult claimant to rule in favor of.

Still, the ALJ is not allowed to make the kind of ruling she did here. There are times when ALJs are chastised for not understanding addicts, *see Kangail*, 454 F.3d at 629, or the poor, *see Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), or even millionaires. *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995). But although the ALJs deal with claimants from all walks of life, hundreds of times each year, they may not be given the credit they arguably deserve for developing insight into the human condition. Experience, after all, is of all teachers the most dependable. *Funk v. United States*, 290 U.S. 371, 381 (1933); *United States v. Lutwak*, 195 F.2d 748, 757 (7th Cir. 1952). And it is that experience that "nourishes [a judge's] intuitions" that play so prominent a role in judicial decision making. Richard Posner, How Judges Think, 107 (Harvard University Press 2008). Indeed, "[a]t every stage the judge's reasoning process is primarily intuitive. Given the constraints of time, [5] it could not be otherwise; for intuition is a great economizer on conscious attention." *Id.* at 110.

The rub is that even if it could be argued that "judicial intuitionism," *id.*, were properly at work here, settled precedent nonetheless demands that the ALJ's conclusions be supported by a careful exegesis of the evidence. In the accepted parlance, the ALJ must build a "logical bridge" between the evidence and his conclusions. A number of the cases are collected in *Grieves v. Astrue*, 2009 WL 564717 at *5 (N.D.Ill. 2009). However sound the ALJ's intuitions may have been in this

---

[5] In the context of Social Security hearings, the constraints are staggering. *Rogers v. Barnhart*, 446 F.Supp.2d 828, 833, n.2 (N.D.Ill. 2006).

16

case, the requisite "logical, step-by-step reasoning," How Judges Think, *supra* at 110, demanded by the cases is absent and thus a remand is necessary.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

DATE: 4/15/09